1

2

3

4

5

6

7

8

THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

WASHINGTON CATTLEMEN'S
ASSOCIATION,

          Plaintiff,

   v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; ANDREW
WHEELER, in his official capacity as
Administrator of the United States Environmental
Protection Agency; UNITED STATES ARMY
CORPS OF ENGINEERS; and R.D. JAMES, in
his official capacity as Assistant Secretary for
Civil Works, Department of the Army,

          Defendants,

and

PUGET SOUNDKEEPER ALLIANCE, IDAHO
CONSERVATION LEAGUE, and SIERRA
CLUB,

          Defendant-Intervenors.

Case No. 2:19-cv-00569-JCC

DEFENDANT-INTERVENORS'
RESPONSE IN OPPOSITION TO SECOND
MOTION FOR PRELIMINARY
INJUNCTION

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................1

REGULATORY BACKGROUND .............................................................................2

    I.     THE 2015 CLEAN WATER RULE ..............................................2

    II.    THE 2020 NAVIGABLE WATERS RULE.....................................5

ARGUMENT .............................................................................................................7

    I.     THE STANDARD FOR INJUNCTIVE RELIEF REQUIRES PLAINTIFF
           TO DEMONSTRATE FOUR FACTORS................................7

    II.    CATTLEMEN HAVE FAILED TO SHOW HARM TO THEIR
           INTERESTS, MUCH LESS IRREPARABLE HARM.....................8

          A.    Cattlemen Fail To Demonstrate Any Actual Imminent Harm From
                The Narrowed Clean Water Act Protections Afforded By The
                Navigable Waters Rule. ...........................................9

          B.    Cattlemen Will Not Suffer Irreparable Constitutional Harm.....................15

    III.   CATTLEMEN HAVE NOT DEMONSTRATED, AND CANNOT
           DEMONSTRATE, A LIKELIHOOD OF SUCCESS ON THE MERITS
           OF ITS CLAIMS. ...................................................16

          A.    The Clean Water Act Supports Broad Application Of Its
                Protections To Ensure The Physical, Chemical, And Biological
                Integrity Of All The Nation's Waters. ...........................16

          B.    Courts Have Uniformly Supported Broad Application Of Clean
                Water Act Protections. ..........................................18

          C.    Cattlemen's Arguments Regarding The Plurality In *Rapanos* Do
                Not Support A Ruling For Cattlemen On The Merits.............................19

          D.    The Agencies Have The Authority To Protect The Challenged
                Waters Under Either Justice Kennedy's Opinion Or Justice
                Scalia's Opinion From *Rapanos*. ...............................25

                1.    Justice Scalia plurality .................................25

                2.    Justice Kennedy Concurrence.....................................26

    IV.   THERE IS NO CONSTITUTIONAL VIOLATION IN THE
           NAVIGABLE WATERS RULE. ....................................28

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)          -i-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

V.    THE BALANCE OF HARMS AND PUBLIC INTEREST TIP
      SHARPLY IN FAVOR OF DENYING THE REQUEST FOR
      INJUNCTIVE RELIEF..................................................................30

      A.    The Harms Caused By The Unpermitted Pollution And Destruction
            Of The Challenged Waters Would Be Significant.....................................30

      B.    The Preliminary Injunction Is Not In The Public's Interest Because
            The Public Interest Is In Protecting Public Water Resources. ...................33

CONCLUSION....................................................................................................34

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                    -ii-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*All. Of Auto. Mfrs. v. Hull*,
    137 F.Supp. 2d 1165 (D. Ariz. 2001) ...................................................................15

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ...........................................................................8

*Am. Paper Inst., Inc. v. EPA*,
    890 F.2d 869 (7th Cir. 1989) .............................................................................17

*Assoc. Gen'l Contractors of Cal., Inc. v. Coal. for Economic Equity*,
    950 F.2d 1401 (9th Cir. 1991) .....................................................................8, 15

*Colorado R. Indian Tribes v. Town of Parker*,
    776 F.2d 846 (9th Cir. 1985) ...............................................................................8

*County of Maui, Hawaii v. Hawaii Wildlife Fund*,
    140 S. Ct. 1462 (2020) .......................................................................................24

*Davis. United States v. Robertson*,
    875 F.3d 1281 (9th Cir. 2017), *cert. granted, judgment vacated on other*
    *grounds*, 139 S. Ct. 1543 (2019) ....................................................................22

*Duarte Nursery, Inc. v. U.S. Army Corps of Engineers*,
    17 F. Supp. 3d 1013 (E.D. Cal. 2014)................................................................12

*EPA v. California ex rel. St. Water Resources Control Bd.*,
    426 U.S. 200 (1976)...........................................................................................17

*Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*,
    739 F.2d 466 (9th Cir. 1984) ...............................................................................8

*Idaho Conserv. League v. Atlanta Gold Corp.*,
    879 F. Supp. 2d 1148 (D. Id. 2012) ..................................................................33

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987)....................................................................................18, 29

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v.*
    *Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ...............................................................................7

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

(No. 2:19-cv-00569-JCC)       -iii-

*Marks v. United States,*
    430 U.S. 188 (1977) .................................................................................21, 22, 23

*Mazurek v. Armstrong,*
    510 U.S. 968 (1997) ................................................................................................8

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
    138 S. Ct. 617 (2018) ...........................................................................................24

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ..............................................................................................28

*Northern Cal. River Watch v. City of Healdsburg,*
    496 F.3d 993 (9th Cir. 2007) ..........................................................................21, 22

*Oregon State Public Interest Res. Grp. v. Pacific Coast Seafoods Co.,*
    374 F. Supp. 2d 902 (D. Or. 2005) ......................................................................33

*PPL Montana, LLC v. Montana,*
    565 U.S. 576 (2012) .......................................................................................24, 28

*Precon Dev. Corp., Inc. v. U.S. Army Corps of Engineers,*
    633 F.3d 278 (4th Cir. 2011) ...............................................................................23

*Rapanos v. United States,*
    547 U.S. 715 (2006) ...................................................................................... *passim*

*S.O.C., Inc. v. County of Clark,*
    152 F.3d 1136 (9th Cir. 1998) .............................................................................15

*Sackett v. EPA,*
    566 U.S. 120 (2012) ..............................................................................................24

*San Francisco Baykeeper v. Cargill Salt Div.,*
    481 F.3d 700 (9th Cir. 2007) ...............................................................................21

*Sierra Forest Legacy v. Rey,*
    577 F.3d 1015 (9th Cir. 2009) .............................................................................30

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers,*
    531 U.S. 159 (2001) .......................................................................................19, 28

*Southeast Alaska Conserv. Council v. U.S. Army Corps of Engineers,*
    472 F.3d 1097 (9th Cir. 2006) .............................................................................33

*U.S. Army Corps of Engineers v. Hawkes Co.,*
    136 S. Ct. 1807 (2016) .........................................................................................24

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

*United States v. Ashland Oil & Transp. Co.*,
   504 F.2d 1137 (6th Cir. 1974) ...................................................................28, 29

*United States v. Bailey*,
   571 F.3d 791 (8th Cir. 2009) ..............................................................................23

*United States v. Clark*,
   617 F.2d 180 (9th Cir. 1980) ..............................................................................22

*United States v. Cundiff*,
   555 F.3d 200 (6th Cir. 2009) ..............................................................................23

*United States v. Davis*,
   825 F.3d 1014 (9th Cir. 2016) (en banc) ......................................................21, 22

*United States v. Donovan*,
   661 F.3d 174 (3d Cir. 2011) ................................................................................23

*United States v. Gerke*,
   464 F.3d 723 (7th Cir. 2006) ..............................................................................23

*United States v. Johnson*,
   467 F.3d 56 (1st Cir. 2006) .................................................................................23

*United States v. LaPant*,
   No. 2:16-CV-01498-KJM-DB, 2019 WL 1978810 (E.D. Cal. May 3, 2019) .......12

*United States. v. Lucas*,
   516 F.3d 316 (5th Cir. 2008) ..............................................................................23

*United States v. Moses*,
   496 F.3d 984 (9th Cir. 2007) ..............................................................................21

*United States v. Riverside Bayview Homes, Inc.*,
   474 U.S. 121 (1985)...........................................................................18, 19, 27

*United States v. Robison*,
   505 F.3d 1208 (11th Cir. 2007) ..........................................................................23

*Utah v. United States*,
   403 U.S. 9 (1971)................................................................................................28

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)............................................................................................8, 30

**Federal Statutes**

33 U.S.C. §§ 1251-388 ............................................................................................2

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)          –v–

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

33 U.S.C. § 1251(a) ........................................................................................16, 17, 29

33 U.S.C. § 1311(a) ......................................................................................................30

33 U.S.C. § 1342 ...........................................................................................................30

33 U.S.C. § 1344(a) ......................................................................................................30

33 U.S.C. § 1344(f) .......................................................................................................13

33 U.S.C. § 1344(f)(1)(A) .............................................................................................14

33 U.S.C. § 1344(f)(1)(C) .............................................................................................14

33 U.S.C. § 1344(f)(1)(E) .............................................................................................14

33 U.S.C. § 1362(7) ................................................................................................16, 17

33 U.S.C. § 1370 ...........................................................................................................29

**Regulations**

44 Fed. Reg. 32,854 (June 7, 1979) .............................................................................17

79 Fed. Reg. 22,188 (Apr. 21, 2014) .........................................................................2, 3

80 Fed. Reg. 37,054 (June 29, 2015) ...........................................................2, 3, 5, 29

85 Fed. Reg. 22,250 (Apr. 21, 2020) ................................................................. *passim*

**Constitutional Provisions**

United States Constitution Tenth Amendment ....................................................15, 29

**Legislative History**

S. Rep. No. 92-414 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668..............................19

S. Rep. No. 92-414, *reprinted in* 1972 U.S.C.C.A.N. ..................................................17

**Other Authorities**

*"Waters of the United States*,", Figure III-9 (Jan. 22, 2020), *available at*
https://www.epa.gov/sites/production/files/2020-
01/documents/econ_analysis_-_nwpr.pdf.............................................................31

*"Waters of the United States*,", Figure III-9 (Jan. 22, 2020),
https://www.epa.gov/sites/production/files/2020-
01/documents/econ_analysis_-_nwpr.pdf.............................................................32

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

"Connectivity of Streams and Wetlands to Downstream Waters: A Review and
    Synthesis of the Scientific Evidence" (2015) ...................................................................2, 4

Robert L. Glicksman & Matthew R. Batzel, *Science, Politics, Law,* ...........................................17

Wash. U. J. L. & Pol'y 099, 102-03 (2010)...................................................................................17

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

INTRODUCTION

The rule challenged by Plaintiff Washington Cattlemen's Association ("Cattlemen") in this case dramatically limits the reach of the Clean Water Act, stripping the statute's protections from vast numbers of waters that have been covered for decades. With its motion, however, Cattlemen seek to restrict the Clean Water Act's reach even further, asking this Court to take the extraordinary step of editing the new rule to remove protections for all tributaries that do not "flow[] continuously year round" and all wetlands that do not directly "abut" other protected waters on the surface. Pl.'s Second Mot. for Prelim. Inj. ("Mot.") 7-8, ECF No. 77.

Cattlemen do not satisfy any of the four factors necessary for preliminary injunctive relief, much less the heightened standard necessary for the mandatory injunctive relief sought here. First, Cattlemen demonstrate no potential harm to its members, much less imminent, irreparable harm, from allowing the U.S. Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers ("Corps") (collectively the "Agencies") to apply Clean Water Act protections to the significantly fewer waterbodies covered under the new rule during the pendency of this litigation. Second, Cattlemen's legal claims are meritless. They are in conflict with the Clean Water Act's broad mandate to restore and protect the nation's waters, are unsupported by case law, and do not raise any constitutional issue of merit. Finally, in contrast to the lack of harm shown by Cattlemen, the potential harm to the public interest, and to many waters that have been protected under the Clean Water Act for more than forty years, is great.

Defendant-Intervenors Puget Soundkeeper Alliance, Sierra Club, and Idaho Conservation League (the "Clean Water Groups") ask the Court to deny Cattlemen's request for a preliminary injunction.

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

REGULATORY BACKGROUND

I.      THE 2015 CLEAN WATER RULE

In 2015, the Agencies published the "Clean Water Rule," which defined the term "waters of the United States" under the Clean Water Act. 80 Fed. Reg. 37,054 (June 29, 2015).  The Clean Water Rule, based upon Justice Kennedy's "significant nexus" test in *Rapanos v. United States*, 547 U.S. 715 (2006), was the first revision to regulations interpreting "waters of the United States" in more than thirty years.  33 U.S.C. §§ 1251-388; 80 Fed. Reg. at 37,073-74.  As the foundation for the Clean Water Rule, the Agencies relied on a published "synthesis of published peer-reviewed scientific literature discussing the nature of connectivity and effects of streams and wetlands on downstream waters," prepared by EPA's Office of Research and Development, entitled "Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence" (2015) ("Science Report"), ECF No. 38-2. 79 Fed. Reg. 22,188, 22,189 (Apr. 21, 2014).  In preparing the Science Report and the Clean Water Rule, EPA reviewed more than 1,200 peer-reviewed scientific papers as well as other data and information, including jurisdictional determinations, relevant agency guidance and implementation manuals, and federal and state reports that addressed the connectivity of aquatic resources.  The Science Report documented the extensive evidence demonstrating that tributaries and wetlands play critical roles in maintaining the physical, chemical, and biological integrity of downstream waters.

The Clean Water Rule identified three basic categories of waters:  (1) waters categorically protected under the Clean Water Act in all instances; (2) waters protected under the Act on a case-by-case showing of significant nexus; and (3) waters categorically excluded from protection under the Act.  The rule also contained various provisions that, for the first time, adopted

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                          -2-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

standardized definitions for key terms such as "tributary" and "adjacent" (used in conjunction with

wetlands). 80 Fed. Reg. at 37,075-86. Based on the evidence in the Science Report, the Clean

Water Rule provided categorical Clean Water Act protection for:

    i.  All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

    ii.  All interstate waters, including interstate wetlands;

    iii.  The territorial seas;

    iv.  All impoundments of waters otherwise identified as waters of the United States under . . . [the rule];

    v.  All tributaries . . . of waters identified in . . . [the preceding sections of the rule]; [and]

    vi.  All waters adjacent to a water identified in . . . [the preceding sections of the rule], including wetlands, ponds, lakes, oxbows, impoundments, and similar waters.

80 Fed. Reg. at 37,114. Also, based on the findings of the Science Report and the Agencies, the

Clean Water Rule defined "tributary" as "a water that contributes flow, either directly or through

another water[,]" to traditional navigable waters, interstate waters, or the territorial seas, and that

"is characterized by the presence of the physical indicators of a bed and banks and an ordinary

high water mark," 79 Fed. Reg. at 22,189, 22,199; 80 Fed. Reg. at 37,058-59, 37,065, 37,115,

and defined "adjacent wetlands" to include those "bordering, contiguous, or neighboring a water

[otherwise protected under the regulation], including waters separated by constructed dikes or

barriers, natural river berms, beach dunes, and the like." 80 Fed. Reg. at 37,058, 37,105.

        The Science Report found unequivocal consensus evidence that all tributaries—including

perennial, *intermittent*, and *ephemeral* streams—"exert a strong influence on the integrity of

downstream waters," and that all tributaries have a significant nexus to navigable-in-fact waters,

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                    -3-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

1  interstate waters, and the territorial sea.  Science Report at ES-2.  Tributaries, to a large degree,

2  determine the character of the water downstream—physically, chemically, and biologically.  *Id*.

3  at 3-45 to 3-46.  Tributaries supply initial flow to downstream waters like rivers, as well as the

4  materials that form a river's bed and banks, such as sediment, and the materials that fill it, such

5  as water, nutrients, and organisms.  *See, e.g.*, *id*. at 3-47 tbl.3-1, 4-40 tbl.4-3.  In some cases, they

6  do this by filtering or settling out, or delaying the delivery of, other materials like contaminants

7  or floodwaters.  *Id*. at 3-47 tbl.3-1, 4-40 tbl.4-3.  Tributaries can also serve as nurseries or

8  spawning areas during certain times of the year for species that then migrate downstream later in

9  their life stages, for example, as part of migrating salmon lifecycles on both coasts.  *See, e.g.*, *id*.

10  at ES-5, ES-13, 1-9, 2-40, and 2-44.

11      The Science Report also found clear evidence that wetlands and open waters in

12  floodplains are "highly connected" to tributaries and rivers "through surface water, shallow

13  ground water, and biological connectivity."  Science Report at ES-2, 4-1, 4-39.  The report

14  found, too, that wetlands and open waters located outside of floodplains serve numerous

15  functions such as floodwater storage, intercepting contaminants and filtering them through the

16  roots of wetland plants, replenishing water supplies, and supporting species dependent upon

17  certain hydrologic ecosystems—all of which are important in maintaining the integrity of

18  downstream waters.  *Id*. at ES-3, 4-20, 4-38, 4-11, 4-14.

19      Finally, also based upon the findings in the Science Report, the Agencies found that

20  certain categories of waters should be protected on a case-by-case basis when necessary to

21  protect the physical, chemical, or biological integrity of downstream waters and to serve the

22  objectives of the Act.  The first category of waters eligible for case-specific determinations

23  included enumerated, ecologically specific types of wetlands—prairie potholes, Carolina and

24

25  DEFENDANT-INTERVENOR RESPONSE IN
   OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

   *Earthjustice*
   *810 Third Ave., Suite 610*
   *Seattle, WA  98104*
   *(206) 343-7340*

26  (No. 2:19-cv-00569-JCC)                    -4-

Delmarva bays, pocosins, Western vernal pools, and Texas coastal prairie wetlands—considered ecologically similarly situated and combined within a watershed for the purposes of making a "significant nexus" determination.  80 Fed. Reg. at 37,114.  Such waters would meet the definition of "waters of the United States" under the rule if they were "determined, on a case-specific basis, to have a significant nexus to a water" otherwise protected under the rule.  *Id.*  The second category of waters eligible for a case-specific determination included "waters located within the 100-year floodplain of . . . [another protected] water . . . and all waters located within 4,000 feet of the high tide line or ordinary high water mark of . . . [another protected] water . . . where they are determined on a case-specific basis to have a significant nexus to [such] a water[.]"  *See, e.g.*, *id.*

II.     THE 2020 NAVIGABLE WATERS RULE

Under the current administration, the Agencies have abandoned the Clean Water Rule, replacing it with a rule that substantially narrows the scope of the "waters of the United States" that are protected under the Clean Water Act.  The Agencies repealed the Clean Water Rule, then replaced it with a completely new definition of "waters of the U.S." severely curtailing application of the Clean Water Act.  The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250, 22,338-39 (Apr. 21, 2020) ("Navigable Waters Rule").  The Navigable Waters Rule redefines waters protected by the Clean Water Act, limiting them to:

1)  the territorial seas, and waters which are currently used, or were used in the past, or may be susceptible to use, in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide;

2)  tributaries;

3)  lakes and ponds, and impoundments of jurisdictional waters; and

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                    -5-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

4)   adjacent wetlands.

*Id*. at 22,338.  Waters now categorically excluded from Clean Water Act protections include:

1)   waters or water features that are not specifically identified in the rule as categorically jurisdictional;

2)   groundwater, including groundwater drained through subsurface drainage systems;

3)   "ephemeral" features, including ephemeral streams, swales, gullies, rills, and pools; (4) diffuse stormwater run-off and directional sheet flow over uplands;

4)   ditches that are not waters identified elsewhere in the definition;

5)   prior converted cropland;

6)   artificial lakes and ponds including water storage reservoirs and farm, irrigation, stockwatering and log-cleaning ponds…

*Id*. at 22,338.  The Navigable Waters Rule has no provision for case-by-case jurisdictional determinations, meaning that waters not expressly identified as protected will be excluded from protection, even if they have a significant nexus to other waters protected under the Act.

The Navigable Waters Rule additionally limits protections under the Act by substantially narrowing and rejecting the definition of tributaries and adjacency in the Clean Water Rule that had been based upon the Science Report, with new definitions of "ephemeral" and "intermittent" tributaries.  Citing Justice Scalia's plurality opinion in *Rapanos* for support, the regulation narrows the definition of "tributaries" to exclude all waters that are considered "ephemeral," meaning waters that flow "only in direct response to precipitation" in a typical year. *Id*. at 22,338-39.  The rule only protects tributaries that are "perennial or intermittent in a typical year." *Id*. at 22,339.  Intermittent tributaries are defined as "surface water flowing continuously during certain times of the year and more than in direct response to precipitation (e.g., seasonally when the groundwater table is elevated or when snowpack melts)."  *Id*. at 22,338.

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                        -6-

The Navigable Waters Rule also narrows the definition of wetlands that are "waters of the United States," generally limiting protections to wetlands that directly abut, on the surface and on at least one side, another protected water. *Id.* The rule maintains protections for other wetlands under three circumstances. First, connected wetlands that are separated from a protected water by only a "natural berm, bank, dune or similar natural feature" remain protected. *Id.* Second, wetlands that are separated from a protected water only by an "artificial dike, barrier, or similar artificial structure" may be protected, but only if the barrier allows for a *direct surface-water* connection to the protected water in a typical year through a culvert, flood or tide gate, or pump. *Id.* at 22,338. Finally, wetlands that are inundated by flooding by a protected water are protected, but only if that flooding occurs in a "typical year." *Id.*

As the Clean Water Groups argue in related case No. 2:20-cv-00950-JCC, the Navigable Waters Rule unlawfully narrows the tributary and wetlands protections that have been in place for decades. Yet with its motion, Cattlemen ask this Court to constrict the scope of Clean Water Act protections even further. Mot. 7. Specifically, Cattlemen seek to enjoin the portion of the tributary definition that protects "intermittent" tributaries, as well as the portion of the wetlands definition that protects wetlands that are connected to other protected waters, but separated by only natural features or that have a surface connection to other protected waters in a typical year through an artificial feature or via floodwaters (hereinafter, the "Challenged Waters"). *Id.*

ARGUMENT

I.    THE STANDARD FOR INJUNCTIVE RELIEF REQUIRES PLAINTIFF TO DEMONSTRATE FOUR FACTORS.

A plaintiff seeking a preliminary injunction must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *League of*

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)          -7-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

*Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 759 (9th Cir. 2014) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  The moving party must make a "clear showing" on each of these fronts.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011); *Mazurek v. Armstrong,* 510 U.S. 968, 972 (1997).  While the Ninth Circuit has explained that a party can, in some instances, establish the first element by raising and supporting "serious questions" on the merits of the case, *Cottrell*, 632 F.3d at 1134-35, a moving party must always show a real and immediate threat of harm.  *Assoc. Gen'l Contractors of Cal., Inc. v. Coal. for Economic Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991).  The Ninth Circuit also requires a plaintiff who raises "serious questions" on the merits to demonstrate the balance of hardships tips *sharply* in plaintiff's favor.  *Cottrell*, 632 F.3d at 1135.

II.    CATTLEMEN HAVE FAILED TO SHOW HARM TO THEIR INTERESTS, MUCH LESS IRREPARABLE HARM.

As noted above, in the Ninth Circuit, plaintiffs can obtain an injunction only if they demonstrate irreparable harm is likely to occur due to application of the rule or action in question.  *Cottrell*, 632 F.3d 1127 at 1134-5.  Speculative or remote injury is not sufficient to justify the extraordinary remedy of injunctive relief.  *Colorado R. Indian Tribes v. Town of Parker*, 776 F.2d 846, 849-50 (9th Cir. 1985).  Rather, the injury must be actual and imminent and it is the movant's burden to demonstrate this.  *Cottrell*, 632 F. 3d at 1135.  Finally, financial injury is generally not irreparable harm supporting preliminary injunctive relief.  *Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984).  Here, Cattlemen have not, and cannot, demonstrate actual and imminent irreparable injury from the Navigable Waters Rule.

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

A.     <u>Cattlemen Fail To Demonstrate Any Actual Imminent Harm From The Narrowed Clean Water Act Protections Afforded By The Navigable Waters Rule.</u>

Cattlemen seek to drastically shrink the number of waterbodies that will be protected under the Clean Water Act even beyond the significant curtailment of protected waters already imposed by the challenged rule.  To do so, Cattlemen asks the Court to engage in a redlining and redrafting exercise to strike select lines from certain subparts of the Navigable Waters Rule—and thereby eliminate Clean Water Act protections that have been in place for decades.  In support of their Motion, Cattlemen provide no declarations concerning the Navigable Waters Rule or the specific relief they seek, instead relying entirely on two declarations submitted a year ago regarding relief requested as to a repealed, more far-reaching rule, the Clean Water Rule, and resurrection of an entirely different predecessor rule.

The declarations on which Cattlemen rely do not provide evidence of actual, specific harms from the Navigable Waters Rule that would occur in the absence of the requested injunction.  The protections the Cattlemen challenge have in fact existed for over 40 years; there are no new regulatory requirements that will attach or affect Cattlemen because of the Navigable Water Rule.  Rather, the Navigable Waters Rule strips Clean Water Act protections from all ephemeral and some intermittent tributaries, as well as from vast numbers of wetlands nationwide.  Even if it were appropriate for Cattlemen to rely on declarations addressing a different rule, nothing in the Cattlemen's declarations supports the proposition that its members conduct activities on or near the small set of intermittent tributaries—those that "flow[] continuously during certain times of the year" and "more than in direct response to precipitation"—that remain protected under the rule.  85 Fed. Reg. at 22,338-39.  Similarly, nothing in the declarations points to intended activities in specific wetlands that are physically separated from a protected water by a natural or human-made barrier that allows a direct

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                    -9-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

hydrologic surface connection in a typical year.  *Id.*  This is a very specific set of waters and a declarant could identify such a feature on his or her property if it was there.

Rather, Mr. Ledgerwood and Mr. Stokes vaguely speculate that they may, at an indeterminate point in the future, have to obtain permits for polluting unspecified waters on their properties *under the Clean Water Rule.  See generally* Ledgerwood Supp. Decl., ECF No. 34-1; Stokes. Supp. Decl., ECF No. 11-12.

Mr. Legerwood identifies "intermittent, sometimes dry" streams on his property that flow to the Snake River, a navigable water that flows to the Columbia River.  Ledgerwood Decl. at ¶ 3.  Mr. Ledgerwood avers that under the prior Clean Water Rule, his family and Cattlemen's members "will be required to either curtail operations or seek costly permits and suffer significant delays."  *Id.* at ¶ 4.  Mr. Ledgerwood does not describe in either his original or supplemental declaration in 2019 what operations would have been curtailed or how by the Clean Water Rule and of course nothing as to the Navigable Waters Rule, or why that claimed curtailment of operations is dictated by either rule.  In his supplemental 2019 declaration, Mr. Ledgerwood identifies Alpowa Creek, a tributary to the Snake River, as a location for his irrigation pump, a location that he must periodically cleared of silt to keep the pump operational.  Ledgerwood Supp. Decl. at ¶¶ 3-4.[1]  This activity may well be statutorily exempt from permitting, both before and after the any of the rules at issue.  *See* below at 22-23.

Mr. Ledgerwood then claims that he uses equipment to excavate and build silt trap ponds in draws and valleys—which he later describes as ephemeral tributaries—that drain to Alpowa

---

[1] Mr. Ledgerwood also claims he farms "very close to the riparian zone" of Alpowa Creek, *id.* at ¶ 5, but he does not identify any part of either rule that dictates jurisdiction over farming activities in that location.

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                                    -10-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Creek.  Ledgerwood Supp. Decl. at ¶ 7.  Again, ephemeral tributaries are now cut out of Clean Water Act so it is even more unclear how, if at all, Mr. Ledgerwood will be affected by the Navigable Waters Rule.  That is, the Rule potentially provides Mr. Ledgerwood with what he would presumably consider a benefit, not harm.

Finally, Mr. Ledgerwood describes aquatic habitat improvements that he allowed a third party to construct in Alpowa Creek, an activity that is already complete so not threatened in the future from the Navigable Waters Rule.  *Id.* at ¶ 8.  Further, the activity described was likely eligible for coverage under Clean Water Act Nationwide Permit No. 27 for in-stream habitat work, even before either rule—assuming it is not otherwise covered by a statutory exemption.  *See*, previously-filed Brimmer Decl., Ex. E list of nationwide permits, ECF 39.  Nothing about this project suggests any imminent future threat to Mr. Ledgerwood's interests caused by the Clean Water Rule or the Navigable Waters Rule.

Mr. Stokes' initial declaration also fails to demonstrate actual harm from the Navigable Waters Rule, because it does not address the Navigable Waters Rule.  Mr. Stokes asserts his ownership of 2,000 acres in Okanogan County, Washington where he grazes cattle and grows feed crops.  Stokes Decl. at ¶¶ 2 and 3.  His property includes a stream from which he draws for irrigation and "ponds that collect rainwater" that during the rainy season are connected to the stream.  *Id*. at ¶ 4.  He also identifies "a few ephemeral" streams which reach the larger stream "about half of the time."  *Id.*[2]  Mr. Stokes offers nothing more regarding the streams or the ponds on his property or his plans for any of them.  Mr. Stokes does not identify any specific action or

---

[2] Again, the Navigable Waters Rule removes coverage for ephemeral streams.

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                    -11-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

prohibition on his use of his property as a result of either rule.  He has not been denied a permit or been subjected to a permitting process as a result of either rule.

Mr. Stokes generally describes some rangeland conservation projects he has done in the past on his property, describing irrigation efficiencies, fencing, and pumping water to uplands, all of which appear to be upland projects.  *Id.* at ¶ 5.  He describes one project where a government agency consulted with the Corps because a permit might be necessary, but ultimately it was not.  *Id.* at ¶ 6.  Mr. Stokes claimed this resulted in "serious[] delay[]," *id.*, but he provides no detail of precisely how long or what harm came of the "delay" in determining whether he needed a permit.  It is not even clear that this was a project in which Mr. Stokes was directly involved or whether he was simply giving permission for it to occur on his property.

Mr. Stokes initially stated that his concerns stem from things he has read about statements of the Corps of Engineers in two Clean Water Act cases, *id.* at ¶ 7, but each of the cases involve enforcement of the Act ***prior*** to the Clean Water Rule and definitely do not go to the Navigable Waters Rule in question here.  *See United States v. LaPant*, No. 2:16-CV-01498-KJM-DB, 2019 WL 1978810, at *2 (E.D. Cal. May 3, 2019); *Duarte Nursery, Inc. v. U.S. Army Corps of Engineers*, 17 F. Supp. 3d 1013, 1016 (E.D. Cal. 2014).  Mr. Stokes offers no evidence that waters in these two cases are jurisdictional under the Navigable Waters Rule or the Clean Water Rule, but were previously non-jurisdictional.  Mr. Stokes provides no details regarding how the specifics of those cases are different or like any water with which he is concerned or activity he plans or needs to engage in for his operations on his land.

Mr. Stokes also filed a supplemental declaration, wherein he offers more details for waterbodies on or near his property, but still fails to identify specific irreparable harm actually caused (or likely to be caused) by the Clean Water Rule and does not address the Navigable

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                    -12-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Waters Rule at all.  Supp. Decl. 2 ¶ 1, ECF No. 37.  Mr. Stokes does not state that he conducts, or intends to conduct, activities requiring a permit near the only (unnamed) "intermittent tributary" that he cites in his declarations. Stokes Supp. Decl. ¶ 1.  Mr. Stokes discusses an irrigation diversion and silt retention pond as part of the diversion.  Stokes Suppl. Decl. at ¶¶ 3-4 and 7.  Work to maintain irrigation ditches and facilities is exempt from permitting under Section 404 of the Act, and always has been.  33 U.S.C. § 1344(f).  Similarly, diverting irrigation ditches discussed at ¶ 5 of the supplemental declaration, is likely either exempt from permitting or, if it required in-stream habitat work, was eligible for coverage under the nationwide permit for such work.  The work to repair a farm road crossing may be exempt under the same statutory provision.  *Id.* at ¶10.

It appears that Mr. Stokes also excavates in Beaver Creek, a tributary to the Methow River, an important salmon river.  *Id.* at ¶¶ 8 and 9.  Mr. Stokes does not provide much detail concerning Beaver Creek, but from the photos, it appears to be a small stream with potentially perennial flow, with a surface connection to the Methow River.  Excavation within that flowing stream likely required a permit both before ***and*** after the Clean Water Rule as well as before and after the Navigable Waters Rule.  This is because perennially flowing streams that flow to a large river like the Methow have *always* been jurisdictional under the Clean Water Act, consistent with decades of regulation and Supreme Court precedent.  Potential work that Mr. Stokes may wish to do in Beaver Creek is therefore treated the same now as it always has been and as it would be under even the most restricted reading of the *Rapanos* decision.

Finally, Mr. Stokes describes a possible tributary next to a public road.  *Id*. at ¶¶11-13.  Mr. Stokes asserts that at some indefinite point in the future, he will have to excavate in the waterway in order to maintain the public road.  Putting aside the lack of imminence of this

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                -13-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

alleged harm, Mr. Stokes' claim is speculative at best because the road is not a private farm road

so it is unclear that Mr. Stokes is either responsible or even authorized to engage in excavation to

maintain the public road right-of-way.  He offers no evidence to support his assertions.  Further,

it is not clear that the waterway is or would have been subject to the Act before or after the Clean

Water Rule or the Navigable Waters Rule, because the declaration provides little evidence of

what exactly the waterway is.  There is certainly no evidence of imminent harm to Mr. Stokes'

property or interest warranting enjoining Clean Water Act protections for this unnamed tributary

much less for waters across the region.

In fact, many of the activities that are described in the supplemental declarations are

likely unaffected by either rule based upon provisions in the Clean Water Act itself.  Under the

Act, "the discharge of dredged or fill material" is expressly exempt from permitting requirements

if such discharge is "from normal farming, silviculture, and ranching activities such as plowing,

seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest

products, or upland soil and water conservation practices;" "for the purpose of construction or

maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage

ditches," or "for the purpose of construction or maintenance of farm roads."  33 U.S.C. §

1344(f)(1)(A), (C), and (E).  Those statutory exemptions are defined by activity, not by

waterbody, and are unchanged by either the Clean Water or Navigable Waters Rules.

In short, the supplemental declarations fail to describe any harm to the declarants or to

Cattlemen's members as a result of the Navigable Waters Rule.  The pending motion for a

preliminary injunction must accordingly be denied.

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

B.     Cattlemen Will Not Suffer Irreparable Constitutional Harm.

Without submitting any supporting declarations, Cattlemen assert that the challenged provisions of the Navigable Waters Rule inflict irreparable injury on its members simply because Cattlemen allege claims under the Commerce Clause and Tenth Amendment of the United States Constitution.  Cattlemen state that by alleging a Constitutional claim, they are presumably entitled to a preliminary injunction.  That is not the law.  *See, e.g.*, *Assoc. Gen'l Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991).  Mot. 30-32. Cattlemen make no allegation or showing of the type of individual constitutional injury, such as freedom of speech or practice of religion, that that courts generally recognize as constituting irreparable injury.  *See, e.g.*, *S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1148 (9th Cir. 1998); *All. Of Auto. Mfrs. V. Hull*, 137 F.Supp. 2d 1165, 1173 (D. Ariz. 2001).

Rather, Cattlemen's claims are that the Navigable Waters Rule (and/or Justice Kennedy's concurring opinion in *Rapanos*) exceeds Congress' Commerce Clause authority, and that the Navigable Waters Rule impermissibly intrudes on states' local land-use authority in contravention of the Tenth Amendment—constitutional violations that do not directly or immediately affect the individual rights and liberties of Cattlemen's members.  Cattlemen's constitutional claims fall far short of the clear irreparable harm showing required to obtain a preliminary injunction.

Even if Cattlemen reasonably set forth a constitutional claim, that claim must be supported by facts and law, and it does not relieve Cattlemen of making a vigorous showing of irreparable harm tied to that constitutional claim.  Cattlemen have not done so here.

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

III.   CATTLEMEN HAVE NOT DEMONSTRATED, AND CANNOT DEMONSTRATE, A LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIMS.

In order to succeed on the merits, Cattlemen must demonstrate that the Navigable Waters Rule's limited protections for the Challenged Waters are contrary to law.[3]  Cattlemen have failed to make the adequate demonstration. The provisions that Cattlemen seek to enjoin are amply supported by the plain text of the Clean Water Act, its legislative history, and case law.

A.   The Clean Water Act Supports Broad Application Of Its Protections To Ensure The Physical, Chemical, And Biological Integrity Of All The Nation's Waters.

The Clean Water Act's purpose is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  The Clean Water Act provides that jurisdiction for its protections extends to "navigable waters," which Congress broadly defined as "the waters of the United States, including the territorial seas."  *See id.* §§ 1251, 1321, 1342, 1344; *see also id.* § 1362(7).  The broader term "waters of the United States" modifies and defines what Congress considered "navigable waters" in the Clean Water Act.

To carry out Congress' mandate, for nearly three decades, the Agencies implemented the Clean Water Act to broadly protect the nation's waters, including all tributaries and wetlands. Prior to 2015, the core provisions of the regulatory definition for "waters of the United States" had remained largely unchanged since 1979, defining it to include, among other things:

(1) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; (2) Interstate waters, including interstate wetlands; (3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats and wetlands the use, degradation or destruction of which would affect or could affect interstate or foreign commerce . . . ; (4) All impoundments of waters otherwise defined as navigable waters under this paragraph; (5) Tributaries of waters identified in paragraphs (1)-(4) of this section,

---

[3] Again, the Challenged Waters are intermittent tributaries, and any wetlands that are not touching at least at one point or side of, a protected water.  *See*, Mot. at 7.

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                -16-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

including adjacent wetlands; and (6) Wetlands adjacent to waters identified in paragraphs (1)-(5) of this section.

National Pollutant Discharge Elimination System; Revision of Regulations, 44 Fed. Reg. 32,854, 32,901 (June 7, 1979).

The Clean Water Act was the culmination of years of failed efforts by states to protect and clean up the Nation's waters through the implementation of state-based water quality standards. S. Rep. No. 92-414 at 7, *reprinted in* 1972 U.S.C.C.A.N. at 3672; James Salzman & Barton H. Thompson, Jr., Envtl. L. and Pol'y 141 (2d ed. 2007); *see also* Robert L. Glicksman & Matthew R. Batzel, *Science, Politics, Law, and the Arc of the Clean Water Act*, 32 Wash. U. J. L. & Pol'y 099, 102-03 (2010). At the time of the passage of the Clean Water Act, half of the states had not adopted standards and there was little to no implementation of limits or enforcement. *See* Glicksman*, supra*, at 102*; see also EPA v. California ex rel. St. Water Resources Control Bd.*, 426 U.S. 200, 202-09 (1976); *Am. Paper Inst., Inc. v. EPA*, 890 F.2d 869, 870-71 (7th Cir. 1989). Congress realized that a national strategy and system of requirements—a federal "floor"—would be necessary to ensure that waters would be cleaned up and protected into the future. *See* Glicksman, *supra*, at 102*.* Against this backdrop, Congress passed the Clean Water Act with the broad purpose and intent to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

In developing a law that would provide more consistent and comprehensive protections to waters across the Nation, Congress broadly defined "navigable waters" to mean "waters of the United States." 33 U.S.C. § 1362(7). As the law's conference report emphasized, "the conferees fully intend that the term 'navigable waters' be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes." CONG. RESEARCH SERV., A LEGISLATIVE HISTORY OF THE

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)               -17-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972, Senate Consideration of the Rpt. of the Conference Committee at 178 (Oct. 4, 1972). In fact, the Senate Committee on Public Works "was reluctant to define" the term "navigable waters" based "on the fear that any interpretation would be read narrowly[,]" and it reiterated that it "fully intend[ed] that the term 'navigable waters' be given the broadest possible constitutional interpretation." *Id*. at 818.

B. <u>Courts Have Uniformly Supported Broad Application Of Clean Water Act Protections.</u>

The Supreme Court has long reinforced broad application of the Act. For example, in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132 (1985), the Court noted "the Act's definition of 'navigable waters' as 'the waters of the United States' makes it clear that the term 'navigable' as used in the Act is of limited import," because "Congress evidently intended to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes . . . ." *Id*. at 133. The Court "recognize[d] that Congress intended to allow regulation of waters that might not satisfy traditional tests of navigability . . ." *Id*. at 133; *see also Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 486 n.6 (1987) (noting that "navigable waters" has been "construed expansively to cover waters that are not navigable in the traditional sense"). In *Riverside Bayview*, the Court upheld the Act's application to wetlands adjacent to traditional navigable waters, observing that the Act incorporates a "broad, systemic view of the goal of maintaining and improving water quality." *Riverside Bayview Homes, Inc.*, 474 U.S. at 132. The Court explained that in light of the "breadth of federal regulatory authority contemplated by the Act," and the difficulty of line-drawing in this context, the Corps' ecological judgment that wetlands have significant impacts on water quality and biological functions in adjacent waterways was sufficient to deem such wetlands covered by the Act. *Id*. at 134. The Court also noted Congress's determination that "[p]rotection of aquatic ecosystems … demanded broad

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                    -18-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

federal authority to control pollution, for '[w]ater moves in hydrologic cycles and it is essential that discharge of pollutants be controlled at the source.'"  *Id.* at 132-33 (quoting S. Rep. No. 92-414 at 77 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3742).

The Court reiterated the importance of a waterway's impact on downstream waters when examining the Act's scope in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers* ("*SWANCC*"), 531 U.S. 159 (2001).  In that case, the Court ruled that the Agencies' "Migratory Bird Rule" could not be used to *extend the reach* of the Act to an abandoned sand and gravel pit.  *Id.* at 162, 164.  The Court distinguished the wetlands in *Riverside Bayview* from the sand and gravel pit in *SWANCC* because the gravel pit lacked the "significant nexus" that *Riverside Bayview* wetlands had with traditional navigable waters.  *See id.* at 167-68 (noting: "It was the significant nexus between the wetlands and 'navigable waters' that informed our reading of the CWA in *Riverside Bayview Homes.*").  The Court did not invalidate any portion of the regulations, however, holding only that the regulations, "as clarified and applied to petitioner's balefill site" under the Migratory Bird Rule, exceeded the Corps' authority.  *Id.* at 174.

C.  <u>Cattlemen's Arguments Regarding The Plurality In *Rapanos* Do Not Support A Ruling For Cattlemen On The Merits.</u>

Cattlemen seek to enjoin the challenged provisions of the Navigable Waters Rule by asserting that the Scalia plurality is the lone rule of law that derives from *Rapanos*.[4]  Mot. 13-28. This assertion is wrong.  As explained below, the Ninth Circuit has specifically adopted Justice Kennedy's "significant nexus" test as the rule that came out of *Rapanos*.  In addition, none of the

---

[4] Cattlemen's confusing argument that issue preclusion dictates their success on the merits, Mot. 11-13, is inapplicable because neither the *Rapanos* court nor any other court has held that the Agencies lack the authority to protect the challenged waters under the Clean Water Act.  *See also* argument by Corps and EPA Opposition to Pl.'s Second Mot. for Prelim. Inj, ECF 82 at 24-26.

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                          -19-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Supreme Court cases cited by Cattlemen are on point or stand for the proposition that Justice Scalia's opinion alone controls, and none of the courts of appeals that have addressed the question have come to this conclusion.

In *Rapanos v. United States*, 547 U.S. 715 (2006), the Court issued a fractured opinion with no majority.  In *Rapanos*, the Court remanded for further review, the Corps' determination that certain wetlands adjacent to non-navigable waters were "waters of the United States." 547 U.S. at 729, 757, 759.  A four-Justice plurality authored by Justice Scalia devised a very restrictive jurisdictional test based on the permanence of surface flow, while again recognizing that the Act applies more broadly to waters beyond "traditionally navigable" waters.  *Id*. at 732, 757 (plurality opinion).  Justice Kennedy concurred in remand as a result, but employed the "significant nexus" test, finding that ensuring restoration and protection of the chemical, physical, and biological integrity of our nation's waters, requires that waters having a significant nexus to traditionally navigable waters, be protected.  *Id*. at 759 (Kennedy, J., concurring in the judgment).  Justice Kennedy's "significant nexus" test would protect tributaries that don't flow all the time and wetlands with a significant nexus to waters traditionally considered navigable.  *Id*. at 759, 787.  Such nexus exists where wetlands or other waters, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"  *Id*. at 780.  The four dissenting Justices would have deferred to the Corps' existing regulations as the proper test, but, recognizing the difficulty inherent in applying the fractured decision, they also agreed that *waters that meet either Justice Kennedy or Justice Scalia's test are protected under the Clean Water Act*.  *Id*. at 810 (Stevens, J., dissenting).

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Under the Supreme Court's *Marks* doctrine, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977). The Ninth Circuit has directly addressed which opinion from *Rapanos* is the narrowest ground under the *Marks* doctrine. In *City of Healdsburg*, the Ninth Circuit found that Justice Kennedy's concurrence in *Rapanos*—not Justice Scalia's plurality opinion—controls under a *Marks* analysis. *Northern Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 995 (9th Cir. 2007). The Ninth Circuit held that because the "significant nexus" test is "the narrowest ground to which a majority of the Justices would assent if forced to choose in almost all cases, . . . Justice Kennedy's concurrence provides the controlling rule of law[.]" *Id.* at 999–1000; *see also United States v. Moses*, 496 F.3d 984, 990 (9th Cir. 2007) (discussing Justice Kennedy's "opinion as the controlling rule of law"); *San Francisco Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 707 (9th Cir. 2007) (referring to Justice Kennedy's "controlling concurrence").

The Ninth Circuit's opinion in *United States v. Davis*, cited by Cattlemen, did not reach—and does not require— a different result. *Cf.* Mot. 17-28. There, the court adopted a "reasoning-based approach to applying *Marks*." *United States v. Davis*, 825 F.3d 1014, 1021 (9th Cir. 2016) (en banc). The court found:

> [W]hen applying *Marks* to a fractured Supreme Court decision, we look to those opinions that concurred in the judgment and determine whether one of those opinions sets forth a rationale that is the logical subset of other, broader opinions. When, however, no "common denominator of the Court's reasoning" exists, we are bound only by the "specific result."

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                    -21-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1   *Id.* at 1028.  The *Davis* court made no mention of the application of *Marks* to *Rapanos*.

2   And in fact, *Rapanos* presents that very case where there is no common denominator;

3   there is no subset as between the plurality and Justice Kennedy.

4          In a case conspicuously not cited by Cattlemen, the Ninth Circuit has considered and

5   expressly rejected Cattlemen's argument that *City of Healdsburg* no longer controls as a result of

6   *Davis*.  In *United States v. Robertson*, the court held that *City of Healdsburg* "remains valid and

7   binding precedent" after *Davis*.  *United States v. Robertson*, 875 F.3d 1281, 1292 (9th Cir.

8   2017), *cert. granted, judgment vacated on other grounds*, 139 S. Ct. 1543 (2019).  Specifically,

9   the *Robertson* court found that *Davis* did not foreclose consideration of a dissent as the "broader

10  opinion" in a *Marks* analysis, and in *Rapanos*, "[b]oth the plurality and Justice Kennedy's

11  opinions can be viewed as subsets of Justice Stevens's dissent because both narrow the scope of

12  federal jurisdiction."[5]  *Id.*  The court went on to reaffirm that Justice Kennedy's concurrence "is

13  narrower than the plurality opinion because it restricts federal authority less."  *Id.*  Though the

14  decision in *Robertson* was vacated by the Supreme Court on unrelated mootness grounds, the

15  Ninth Circuit's reasoning concerning *Marks* is still applicable and persuasive and should be

16  applied by this Court.  *See United States v. Clark*, 617 F.2d 180, 184 n.4 (9th Cir. 1980) (holding

17  that where reasoning on a precise issue is not invalidated by a Supreme Court vacatur, it remains

18  persuasive and may be adopted by subsequent courts).

19         Neither the Supreme Court nor any court of appeals has endorsed the Cattlemen's

20  misguided view that the narrowest holding is that which alters (or restrains) federal jurisdiction

21

22

23  ---

[5] And this principle, articulated by the Ninth Circuit, is directly contrary to and rejects the wholly unsupported assertion by Cattlemen on page 19 of their Motion regarding the treatment of a dissenting opinion.

24

25  DEFENDANT-INTERVENOR RESPONSE IN
    OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

26  (No. 2:19-cv-00569-JCC)                    -22-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1    to the greatest extent. *See* Mot. 19-23. To the contrary, courts considering *Rapanos* have held

2    that the narrowest holding is the holding that restricts federal authority the least, or that would

3    result in the slightest change to the existing law. *See Rapanos*, 547 U.S. at 810 n.14 (Stevens, J.,

4    dissenting) ("I assume that Justice Kennedy's approach will be controlling in most cases because

5    it treats more of the Nation's waters as within the Corps' jurisdiction[.]"); *United States v.*

6    *Robison*, 505 F.3d 1208, 1221 (11th Cir. 2007) ("The issue becomes whether the definition of

7    'navigable waters' in the plurality or concurring opinions in *Rapanos* was less far-reaching (i.e.,

8    less-restrictive of CWA jurisdiction)."); *United States v. Gerke*, 464 F.3d 723, 724-25 (7th Cir.

9    2006) (finding that Justice Kennedy's "test is narrower (so far as reining in federal authority is

10   concerned) than the plurality's in most cases"); *see also United States v. Cundiff*, 555 F.3d 200,

11   209 (6th Cir. 2009) ("*Marks* does not imply that the 'narrowest' *Rapanos* opinion is whichever

12   one restricts jurisdiction the most.").

13         In addition to the Ninth Circuit, every other circuit court that has addressed the issue of

14   Clean Water Act jurisdiction following *Rapanos* has either applied *only* Justice Kennedy's

15   "significant nexus" analysis or found that waters that meet *either* Justice Kennedy's or Justice

16   Scalia's approach are "waters of the United States" protected by the Clean Water Act. *United*

17   *States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009); *see also Cundiff*, 555 F.3d at 210 (Sixth

18   Circuit opinion finding if either plurality or Justice Kennedy's test is met, there is a "water of the

19   United States"); *United States v. Johnson*, 467 F.3d 56, 65 (1st Cir. 2006) (same); *Gerke*, 464

20   F.3d at 724 (Seventh Circuit opinion looking to "significant nexus" standard as the governing

21   standard); *Robison*, 505 F.3d at 1222 (Eleventh Circuit opinion noting same); *United States. v.*

22   *Lucas*, 516 F.3d 316, 327 (5th Cir. 2008) (same); *United States v. Donovan*, 661 F.3d 174, 182

23   (3d Cir. 2011) (same); *Precon Dev. Corp., Inc. v. U.S. Army Corps of Engineers*, 633 F.3d 278,

24

25   DEFENDANT-INTERVENOR RESPONSE IN
      OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

289-90 (4th Cir. 2011) (parties agree and court adopts Justice Kennedy "significant nexus" test, approving of Corps definition of "adjacent").

In trying to claim otherwise, Cattlemen cite to a string of irrelevant Supreme Court decisions, none of which address the issue at hand.  *See* Mot. 13-14.  Many cases cited by Cattlemen do not even concern the Clean Water Act.  Mot. 13.  Those that do address the Act and cite to the *Rapanos* plurality do so solely to support statements of fact rather than statements of law, to explain the case's procedural posture, or to allude briefly to dicta in the case.  *See, e.g.*, *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807 (2016) (citing solely to statements of fact that appear in the *Rapanos* plurality, not to legal findings); *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 625 (2018) (citing to statements of fact in the *Rapanos* plurality and explaining that the Supreme Court remanded the case); *see also PPL Montana, LLC v. Montana*, 565 U.S. 576, 592 (2012) (citing to Justice Kennedy's concurrence in *Rapanos*).  None of the cases cited by Cattlemen state or suggest that the plurality is the controlling opinion from *Rapanos*.  In fact, the Supreme Court has emphasized, post-*Rapanos*, that no single opinion in *Rapanos* commanded a majority of the Court.  *See Sackett v. EPA*, 566 U.S. 120, 123-24 (2012).[6]

---

[6] Cattlemen also strain to point to the Court's recent opinion in *County of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020), to support its assertion that the Scalia plurality is the controlling *Rapanos* opinion. Mot. 13-15.  But the Court in *Maui* did not address the scope of "navigable waters" under the statute, much less decide which *Rapanos* opinion is controlling. *See Cty. of Maui*, 140 S. Ct. at 1462.  The mere mention of a court decision, without assessing the reason and context for the citation, means nothing for Cattlemen's arguments regarding Supreme Court jurisprudence here and would flout Ninth Circuit precedent and the conclusion of every other circuit that has addressed the controlling rule of law from *Rapanos*.

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

D.      The Agencies Have The Authority To Protect The Challenged Waters Under Either Justice Kennedy's Opinion Or Justice Scalia's Opinion From *Rapanos*.

Regardless of which *Rapanos* test controls, Cattlemen are not likely to succeed on the merits because neither test precludes the Agencies from protecting the waters challenged by Cattlemen.

1.      *Justice Scalia plurality*

Cattlemen argue they are entitled to a preliminary injunction because Scalia's plurality opinion controls, but they utterly fail to actually apply the opinion to the provisions they challenge, or otherwise explain why the opinion forbids protection of the challenged waters as defined in the Navigable Waters Rule.  And, perhaps that is because Justice Scalia's plurality opinion simply does not address the precise regulatory definitions Cattlemen seek to enjoin here.

Under the standard outlined in Justice Scalia's opinion, tributaries fall within the scope of Clean Water Act when they are "relatively permanent, standing or flowing bodies of water." *Rapanos*, 547 U.S. at 732-33.  Justice Scalia held, however, that the term "relatively permanent" does not exclude streams, rivers, or lakes that might dry up in extraordinary circumstance, nor does it exclude seasonal rivers that contain continuous flow *during some months* of the year, but not during dry months.  *Id.* at 733 n.5.  In other words, Justice Scalia recognized that intermittent streams are protected; his test does not foreclose regulation of intermittent tributaries, defined in the rule as "surface water flowing continuously during certain times of the year and more than in direct response to precipitation (*e.g.*, seasonally . . .)."  85 Fed. Reg. at 22,338.

Similarly, to establish protections over wetlands under Justice Scalia's test, wetlands must have a "continuous surface connection" with a "water of the United States" such that they are adjacent to a protected water.  *Rapanos*, 547 U.S. at 741-41.  But the opinion did not preclude protection of the types of wetlands challenged here—connected wetlands that are

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                                          -25-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

separated by only natural features, or that have a surface connection in a typical year through an artificial feature or via floodwaters.  Thus, the challenged regulatory provisions are not foreclosed by the Scalia plurality in *Rapanos.*

### 2. *Justice Kennedy Concurrence*

Under Justice Kennedy's concurrence in *Rapanos*, the Agencies are well within their authority to protect the waters Cattlemen seek to exclude from the Act's scope.  As previously explained, Justice Kennedy concluded that the Act protects waters with a "significant nexus" to waters traditionally considered navigable.  547 U.S. at 759, 787.  Such nexus exists where the water, including wetlands, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"  *Id*. at 780.  Justice Kennedy acknowledged that so-called "isolated" wetlands may be protected by the Act, singly or in combination with similarly situated wetlands, as they may significantly affect other covered waters "more readily understood as 'navigable,'" and that the Corps may properly determine that proximity, volume of flow (annually or on average), or other relevant considerations form the foundation for protecting a wetland under the Act.  *Id*. at 780.  Similarly, Justice Kennedy noted that wetlands separated by land from another waterway can be vital to that waterway: if such a wetland is destroyed, "floodwater, impurities, or runoff that would have been stored or contained in the wetlands" could instead "flow out to major waterways."  *Id*. at 775.  Justice Kennedy also described the plurality's attempt to impose a continuous flow requirement on tributaries as making little sense, because "torrents thundering at irregular intervals through otherwise dry channels," which could significantly affect downstream waterways, would then not be covered by the protections in the Act.  *Id*. at 769.  Justice Kennedy rightly gave effect to Congress' intent to have science,

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

particularly hydrology, guide the application of the Act and the Navigable Waters Rule protects

even fewer waters than would be protected under Justice Kennedy's test.

Cattlemen make the extraordinary argument that if this Court finds the Kennedy

concurrence controls, the court should preliminarily order the Agencies to effectively rewrite the

rule to require the Corps to make case-by-case jurisdictional determinations of Clean Water Act

coverage for the waters they challenge, instead of allowing categorical protection. Mot. 29. This

argument that categorical inclusion of waters is legally impermissible fails on its face. Justice

Kennedy clearly envisioned categorical protection of waters. *Rapanos*, 547 U.S. at 780-81.

Justice Kennedy specifically concluded that waters could be shown to have a "significant nexus"

on a categorical basis, and all water bodies within those categories should be protected under a

rule, provided that the majority of waters in the class influence downstream water quality. *Id.*

He explained that "[t]he Corps may choose to identify categories of tributaries that, due to their

volume of flow (either annually or on average), their proximity to navigable waters, or other

relevant considerations, are significant enough that wetlands adjacent to them are likely, *in the

majority of cases*, to perform important functions for an aquatic system incorporating navigable

waters." *Id.* (emphasis added). This categorical approach follows that of the unanimous Court in

*Riverside Bayview*, which noted:

> If it is reasonable for the Corps to conclude that *in the majority of cases*, adjacent
> wetlands have significant effects on water quality and the aquatic ecosystem, its
> definition can stand. That the definition may include some wetlands that are not
> significantly intertwined with the ecosystem of adjacent waterways is of little
> moment, for where it appears that a wetland covered by the Corps' definition is in
> fact lacking in importance to the aquatic environment—or where its importance is
> outweighed by other values—the Corps may always allow development of the
> wetland for other uses simply by issuing a permit.

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

474. U.S. at 135 n.9 (emphasis added). The provisions challenged by Cattlemen follow this categorical approach to defining waters with a significant nexus to traditionally navigable waters, and are therefore consistent with and lawful under Kennedy's concurrence.

Cattlemen simply cannot succeed on the merits of their Clean Water Act claims.  Even if Cattlemen had demonstrated harm from the Navigable Waters Rule, Cattlemen fail to demonstrate a likelihood of success on the merits of their claims and are therefore not entitled to a preliminary injunction.

IV.     THERE IS NO CONSTITUTIONAL VIOLATION IN THE NAVIGABLE WATERS RULE.

Cattlemen cannot succeed on the merits of their constitutional claims.  Cattlemen offer no argument in their Motion for Preliminary Injunction to support the merits of their constitutional claims, but if they did, such arguments would fail.

Congress's Commerce Clause authority unquestionably extends to the regulation of waters that are themselves navigable—by definition, channels of commerce.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (Congress may regulate "the channels of interstate commerce"); *PPL Montana, LLC*, 565 U.S. at 592 (waters are "navigable in fact" when they are or may be used "as highways for commerce"); *see also Utah v. United States*, 403 U.S. 9, 10-11 (1971) (waters may be "highways for commerce" even if not interstate); *United States v. Ashland Oil & Transp. Co.*, 504 F.2d 1137, 1325-26 (6th Cir. 1974) (water pollution is "a direct threat to navigation").  By extension, the regulation of waters that significantly affect navigable and interstate waters is also within the authority granted to Congress to regulate channels of commerce.  *See Rapanos*, 547 U.S. at 776 (Kennedy, J., concurring) (explaining that in *SWANCC*, the requirement of a "significant nexus" to navigable waters avoided constitutional difficulties and federalism concerns); *id*. at 782-83 (citing Supreme Court case law

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

explaining, *inter alia*, that regulation of tributaries may be required in order to manage a navigable water); *Ashland Oil*, 504 F.2d at 1326 (Congress may regulate non-navigable stretches of a river to preserve commerce on the navigable portions); *id*. at 1326-28 (federal authority to preserve navigable waters must extend to tributaries of such rivers, lest they become "a mere conduit for upstream waste").  The waters challenged here have a significant impact on the downstream channels of commerce, and therefore squarely fall within Congress's commerce power.  *See, e.g.*, 80 Fed. Reg. at 37,079 (explaining, for example, that "tributaries as a group exert strong influence on the chemical, physical, and biological integrity of downstream waters . . . [t]hese significant effects on traditional navigable waters, interstate waters, and the territorial seas occur even when the tributary is small, intermittent, or ephemeral").

As to the Tenth Amendment claims, Cattlemen offer no argument or support.  The Tenth Amendment gives way to valid exercise of Commerce Clause power—only those rights not reserved to the federal government fall to the states.  Finally, water protected by the Act can *also* be regulated by states imposing more stringent protections; the Act's protections are a floor; a *minimum standard* of protection below which Congress determined, as a nation, we should not allow our most precious resources to fall.  *See* 33 U.S.C. § 1370; *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 499 (1987).  Finally, Cattlemen confuse the *process* of the Clean Water Act that recognizes a federalism approach with some roles for the states, with federal oversight, incorrectly claiming federalism is the purpose of the Clean Water Act.  Mot. 25.  The *purpose* of the Clean Water Act is, as plainly stated by Congress, to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

Cattlemen's constitutional claims have no merit.

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

V.     THE BALANCE OF HARMS AND PUBLIC INTEREST TIP SHARPLY IN FAVOR
       OF DENYING THE REQUEST FOR INJUNCTIVE RELIEF.

While Cattlemen fail to make a demonstration of actual and immediate harm, much less

irreparable harm, from the Navigable Waters Rule, the pollution or destruction of many

Washington waterbodies that would result from this injunction is real, significant, imminent, and

potentially permanent.  Injunctions may only be granted when "the balance of equities tips in

their favor; and [] a preliminary injunction is in the public interest."  *Sierra Forest Legacy v. Rey*,

577 F.3d 1015, 1021 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 19).  The equities and public

interest weigh heavily against an injunction here.

       A.     The Harms Caused By The Unpermitted Pollution And Destruction Of The
              Challenged Waters Would Be Significant.

Cattlemen ask this Court to craft extensive new Clean Water Act exemptions for

intermittent tributaries and many wetlands connected to other protected waters—waters that have

generally been protected by the Act for decades.  If Cattlemen's requested injunction is granted,

the harms to Washington waters and the fisheries and communities that rely on them that would

be caused by the removal of Clean Water Act protections would be profound.  And those harms

include Washington's critically important salmon and steelhead fisheries; a fishery that supports

Washington Tribes's treaty rights to subsistence and cultural practices, that supports a robust

commercial fishery, and that supports recreation and tourism economies.

If the Act does not apply to a tributary or wetland, the prohibitions on discharges of

pollution and dredge and fill activities, and the accompanying permitting processes, do not apply.

*See* 33 U.S.C. § 1311(a); 33 U.S.C. § 1342; 33 U.S.C. § 1344(a). Therefore, enjoining the

challenged provisions will result in these waters losing the protection of these permitting

programs, harming both the unprotected waters and downstream waters.

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                    -30-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

The Agencies' own economic analysis for the Navigable Waters Rule already predicts wide-ranging harms resulting from the rule, even without stripping protections for the additional waters Cattlemen seek to carve out of the Act.  For example, the analysis admits that the expected increases in water pollution caused by the rule will, among other things, increase sediment concentrations in waters, leading to increased needs for dredging of reservoirs and drinking water treatment costs.  *See* EPA, *Economic Analysis for the Navigable Waters Protection Rule: Definition of "Waters of the United States*," at 105, Fig. III-9 (Jan. 22, 2020), *available at* https://www.epa.gov/sites/production/files/2020-01/documents/econ_analysis_-_nwpr.pdf.  The Agencies also explain that the reduction in protections could lead to less stringent permit limits for point sources of pollution, which "could result in reduced protection for aquatic ecosystems and public health and welfare."  *Id*. at 106.  The Agencies further acknowledge that the now-excluded ephemeral streams "support a variety of ecosystem services," and are important for replenishing groundwater for irrigation and drinking water supplies for communities in the arid western U.S.  *Id*. at 107.  The multitude of predicted environmental and economic harms are summarized in the below figure from the Agencies' own economic analysis:

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

**Fig. 1:** Illustration of predicted environmental and economic impacts from the Navigable Waters Rule. Source: EPA, *Economic Analysis for the Navigable Waters Protection Rule: Definition of "Waters of the United States*," at 105, Fig. III-9 (Jan. 22, 2020), https://www.epa.gov/sites/production/files/2020-01/documents/econ_analysis_-_nwpr.pdf

Despite these acknowledged environmental and economic harms from the Navigable Waters Rule, Cattlemen claim the rule should exclude even more waters from protection.  Such a stripping of protections from significant additional categories of waters can only magnify and expand the harms predicted by the Agencies.[7]

---

[7] The harm would not be limited in scope. For example, according to one agency estimate based on National Hydrography Dataset figures, approximately 52% of streams across the country are intermittent, meaning that Cattlemen would strip Clean Water Act protections from over half the streams in the nation. Public Comments of Sierra Club, et al. (April 15, 2019) at Ex. H, *available at* https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-11451.

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                    -32-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

B.     <u>The Preliminary Injunction Is Not In The Public's Interest Because The Public Interest Is In Protecting Public Water Resources.</u>

All citizens of Washington, indeed all citizens of the nation, depend on and are entitled to clean and healthy waters for a multitude of uses.  Washington's rivers, such as the Snake, Spokane, Yakima, and Columbia rivers, as well as the multitude of rivers tributary to Puget Sound such as the Skagit and Nooksack, are resources for irrigation and drinking water; for salmon and commercial, recreational and subsistence fishing; for wildlife and livestock watering; and for all the other uses humans put waters to.  Intermittent streams are essential to the survival and recovery of salmon that are on the Endangered Species Act list, as well as endangered Southern Resident Killer Whales that literally starving because of declines in their salmon prey.  It is this underlying public resource value that makes the protections in the Clean Water Act so fundamental and important.  Even if Cattlemen had provided the Court with any evidence of harm, which they did not, when weighed against the identified and significant harms to Washington waters, the scale plainly tips toward a protective approach for the good of the public as a whole.

In addition, the Ninth Circuit has directed that the public interest strongly favors preventing, not fostering, environmental harm.  *Southeast Alaska Conserv. Council v. U.S. Army Corps of Engineers*, 472 F.3d 1097, 1101 (9th Cir. 2006).  Courts in this Circuit repeatedly find that protecting against environmental harm, including protecting water from pollution, profoundly outweighs financial interest or harm, even if the public has a stake in the financial interest.  *See Oregon State Public Interest Res. Grp. v. Pacific Coast Seafoods Co.*, 374 F. Supp. 2d 902, 908 (D. Or. 2005); *Idaho Conserv. League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1162 (D. Id. 2012).  Thus, even if Cattlemen's members have a financial interest in polluting or

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

destroying waters without permits, which they have not demonstrated, that interest would be profoundly outweighed by the potential harm to those waters and to downstream waters.

CONCLUSION

Cattlemen have made no effort to support their Motion with declarations or other evidence of harm that will befall their members from the Navigable Waters Rule, much less harm that is imminent and irreparable.  Further, Cattlemen's arguments on the merits are contrary to the law finding no support in their claims concerning Supreme Court or Circuit precedent nor in the Clean Water Act itself.  Finally, the balance of harms from further limiting Clean Water Act protections for Washington's waters tips sharply away from a preliminary injunction in this case.  Cattlemen's Motion fails on all factors necessary to grant a preliminary injunction and therefore, the Clean Water Groups respectfully request that this Court deny Cattlemen's Motion for Preliminary Injunction in its entirety.

Respectfully submitted this 14th day of July, 2020.

*/s/ Janette K. Brimmer*
Janette K. Brimmer, WSB # 41271
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA  98104
(206) 343-7340
jbrimmer@earthjustice.org

Anna Sewell, WSB # 48736
EARTHJUSTICE
1625 Massachusetts Avenue, NW, Suite 702
Washington, D.C. 20036
(202) 667-5233
asewell@earthjustice.org

*Counsel for Puget Soundkeeper Alliance, Sierra Club, and Idaho Conservation League*

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                         -34-

**CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.


/s/ Janette K. Brimmer
Janette K. Brimmer

DEFENDANT-INTERVENOR RESPONSE IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

(No. 2:19-cv-00569-JCC)                    -35-

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*